BERNARDO PONS, demandante y recurrido, *v.* LUIS RIVERA.
SANTOS ET AL., demandados y recurrentes.

*Número:* 12641  *Resuelto:* 25 de mayo de 1962

*Hiram R. Cancio, Secretario de Justicia, J. B. Fernández Badillo, Procurador General* y *Jorge Tomás Nido de Goenaga,* abogado del Departamento de Justicia, abogados de los recurrentes; *S. L. Lagarde Garcés,* abogado del recurrido.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

El Juez Asociado Señor Hernández Matos emitió la opinión del Tribunal.

Bernardo Pons, agricultor dedicado al cultivo de café, promovió una acción contra Luis Rivera Santos y Puro A. Camacho, Secretario de Agricultura y Comercio el primero y Director Interino del Seguro del Café de Puerto Rico el segundo, a la fecha de incoarse la reclamación. Pedía en su demanda el actor que se le pagaran las pérdidas de café ascendentes a $14,500.00 que alegó sufrió en el año 1956 en su finca "El Hoyo" del barrio Jayuya Abajo del Municipio de Jayuya, a consecuencia de los huracanes "Santa Clara" y "Greta" ocurridos respectivamente, el 12 de agosto y el 4 de noviembre de ese año y de conformidad con la solicitud de renovación de seguro de café para la cosecha del año

1956–57 y el pago de la prima correspondiente que había hecho.

Los demandados contestaron la demanda, negando que la solicitud de renovación de seguro de cosecha de café fuese depositada en las oficinas del correo de Utuado antes de las 12:00 M., ni que hubiesen actuado sin justa causa o razón legal o en forma ilegal; así mismo negaron que en casos similares o parecidos hubiesen procedido a otorgar pólizas de seguro que cubrieran los daños y perjuicios ocasionados por el temporal "Santa Clara" o "Betsy" y además por falta de información que otras compañías de seguro de cosecha y plantaciones de café pagaran pérdidas en casos similares al del demandante; alegaron en contrario que la notificación hecha por el demandante fue tardía, negando a su vez que las pérdidas asciendan a $14,500.00, terminando con una súplica al Tribunal de que se declarase sin lugar la demanda, con imposición de costas, gastos y honorarios de abogado a la parte demandante.

Fue el pleito a juicio. Se falló a favor del agricultor demandante concediéndole $12,250.00 por pérdidas de café, sus intereses legales, costas y $1,500.00 por concepto de honorarios de abogados.

Las conclusiones en que se fundó la sentencia son claras y precisas. Cubren todos los puntos de hecho y de derecho discutidos.

Las de hecho, que no han sufrido impugnación considerable ante nos, son como siguen:

"CONCLUSIONES DE HECHO.—Que el demandante Bernardo Pons envió el 31 de julio de 1956 desde Caracas, Venezuela, a su administrador, Arsenio Matos Pérez, un giro por el importe de la prima del seguro de cosecha de café de su finca 'El Hoyo' y una carta en que le instruía asegurara la cosecha solamente. Que Arsenio Matos recibió la carta y el giro el día 9 de agosto de 1956, depositó el importe del giro en la cuenta bancaria de Antonia Pons, hermana del demandante, el día 10 de agosto de 1956 y ésta libró un cheque a favor del Secretario de Hacienda en esa misma fecha para pagar el importe de la prima del seguro

de cosecha de la finca 'El Hoyo' de Bernardo Pons, y juró la solicitud de renovación de seguro de cosecha a las 8:00 A. M. de dicho día.

"Que Arsenio Matos depositó en las oficinas de correo de Utuado la solicitud·de renovación de póliza de cosecha de café y el importe de la prima el día 10 de agosto de 1956, entre las 11:30 A. M. y 12:00 M., en un sobre dirigido al Departamento de Agricultura y Comercio—Seguro del Café—Parada 19, Avenida Fernández Juncos—Santurce, Puerto Rico.

"Que la correspondencia de Utuado dirigida a San Juan tan sólo se recoge dos veces al día en las oficinas de correo de Utuado: a las 11:30 A. M. y por la tarde a las 5:00 P. M.; que esta práctica no es igual en todas las oficinas de correo; que el despacho de correspondencia se rige por reglamento interno de cada oficina y que en los pueblos donde hay más movimiento de correspondencia se recoge y despacha con mucha más frecuencia que en los pueblos pequeños. Que toda correspondencia depositada en el correo de Utuado, con anterioridad a las 11:30 A. M., hora en que se recoge, y dirigida a San Juan, es matasellada con un matasello que tiene la hora de las 12:00 M. Que toda correspondencia depositada en el correo de Utuado con posterioridad a las 11:30 A. M. y entre esta hora y las 12:00 M., o con posterioridad a las 12:00 M., y dirigida a San Juan, es matasellada con un matasello que marca la hora de las 5:00 P. M.

"Que la solicitud de renovación de póliza y el importe de la prima del demandante se recibió en las oficinas del Seguro del Café de Puerto Rico el día 13 de agosto de 1956, y que al demandante Bernardo Pons se le extendió una póliza fechada 13 de agosto de 1956 a fin de no cubrir las pérdidas ocasionadas por el temporal 'Santa Clara' o 'Betsy'.

"Que el anuncio del disturbio atmosférico que ocurrió y se conoce como temporal 'Santa Clara' o 'Betsy' se hizo a través de la radio por el Negociado Federal de Servicios Meteorológicos el día 10 de agosto de 1956, a las 12:00 M., o sea, con posterioridad al envío o depósito en el correo de Utuado de la solicitud de renovación de seguro de cosecha de café y cheque cubriendo el pago de la prima, por el Administrador del demandante.

"Que el demandante Bernardo Pons aseguró 300 quintales de café, base pilado, a razón de $50.00 quintal.

"Que la finca 'El Hoyo' fue inspeccionada por empleados del Departamento de Agricultura y Comercio en el programa de Rehabilitación Agrícola de Emergencia para determinar daños

y pérdidas en las mismas con motivo del temporal 'Santa Clara' o 'Betsy' y que estos empleados determinaron que las pérdidas en la cosecha era del 50% del total de la misma, que estimaron en 300 quintales, por lo que dichas pérdidas de cosecha ascienden a 150 quintales.

"Que a pesar de haberse radicado en la fecha indicada anteriormente la declaración de pérdidas postciclónicas, la Oficina del Seguro del Café se negó a pagar las pérdidas ocasionadas por el temporal 'Santa Clara' o 'Betsy' en la finca del demandante.

"Que el 4 de noviembre de 1956 Puerto Rico fue azotado por vientos huracanados conocidos por el nombre de 'Greta' y que el Seguro del Café pagó por las pérdidas ocasionadas a muchos asegurados.

"Que el Seguro del Café se negó a pagar las pérdidas ocasionadas por los vientos huracanados 'Greta' en la finca del demandante y alegó para no pagar que éste notificó por telégrafo haber tenido algunas pérdidas el día 17 de noviembre de 1956, o sea, con posterioridad al término que establece el Reglamento del Seguro del Café para notificarle pérdidas, cuyo término había vencido desde el 14 de noviembre de 1956.

"Que no obstante no haber notificado el demandante pérdidas ocasionadas por los vientos huracanados 'Greta' dentro de los diez (10) días siguientes al siniestro y haberlo hecho tres días después, o sea, el 17 de noviembre de 1956, los inspectores de pérdidas del Seguro del Café pudieron haberlas determinado pues estuvieron en condiciones hábiles para inspeccionar la finca del demandante.

"Que los inspectores de pérdidas del Seguro del Café comenzaron la inspección de fincas para determinar pérdidas por motivo del 'Greta' después del 27 de noviembre de 1956, o sea, once días o más después de haber recibido la notificación telegráfica de algunas pérdidas enviadas por el demandante.

"Que el no inspeccionarse la finca al demandante obedeció a la interpretación hecha por los oficiales del Seguro del Café del alcance de las cláusulas del Reglamento.

"Que en el temporal 'Santa Clara' o 'Betsy' el Seguro del Café admitió notificaciones de pérdidas por carta o telegrama y no exigió la declaración postciclónica a que hace referencia el Reglamento.

"Que la dilación del demandante en notificar pérdidas en su cosecha por motivo del 'Greta' no ocasionó a los aseguradores demandados daños sustanciales de clase alguna y por el

contrario si el Seguro del Café hubiese querido inspeccionar las pérdidas del 'Greta' en la finca del demandante al tiempo en que comenzó a inspeccionar las pérdidas ocasionadas por 'Greta' en otras fincas, o antes, pudo haberlo hecho.

"Que el Seguro del Café de Puerto Rico no estuvo preparado con personal para inspeccionar las pérdidas por motivo del 'Greta' hasta el día 27 de noviembre de 1956 y que por eso no realizó inspecciones de fincas hasta después de esa fecha.

"Que a David Matos, cosechero también de café, se le extendió una póliza fechada con anterioridad al día en que se recibió su solicitud de seguro y el importe de la prima en las oficinas del Seguro de Café en el Departamento de Agricultura y Comercio de Puerto Rico y se le compensó las pérdidas ocasionadas por el temporal 'Santa Clara' o 'Betsy.'

"Que el demandante sólo pudo recolectar y recogió en toda la cosecha 500 almudes de café, o sea, 25 quintales, y que con motivo de los vientos huracanados 'Greta', el demandante perdió de su cosecha 125 quintales de café.

"Que todas las transacciones de seguro de café se hacen a través del correo, ya que no existen oficinas en la Isla de Puerto Rico, con excepción de las oficinas centrales en el Departamento de Agricultura y Comercio en Santurce, donde los agricultores pueden radicar sus solicitudes de pólizas y pagar sus primas.

"Se estipuló por las partes, con la aprobación del Tribunal, que desde 1948 hasta 1953, inclusive, el demandante aseguró con los demandados la cosecha y plantaciones de su finca 'El Hoyo'. En el 1954, solamente aseguró la cosecha y en 1955 aseguró la cosecha y plantaciones. En el 1956, que motiva esta reclamación, sólo aseguró su cosecha de café."

En su recurso contra la sentencia, los demandados hacen el siguiente señalamiento de errores:

"El Hon. Tribunal Sentenciador erró:

"1) Al determinar que existía entre el demandante y el Seguro del Café un contrato de Seguros que cubría y compensaba las pérdidas ocurridas en la cosecha del café por motivos del temporal 'Santa Clara' y otorgarle compensación por dichas pérdidas.

"2) Al no aplicar a esta reclamación las disposiciones de los artículos 1213 y 1214 del Código Civil, edición de 1930.

"3) Al determinar que el demandante tiene derecho a recobrar del Seguro del Café el importe de las pérdidas sufridas con motivo del huracán 'Greta' de acuerdo a la póliza de seguro que a tales efectos estaba en vigor.

"4) Al dictaminar en su sentencia que el Seguro del Café pagaría intereses legales a partir de la fecha de la ocurrencia de cada uno de los siniestros.

"5) Al admitir en evidencia recortes de periódicos utilizando su contenido para dictar sentencia, siendo dicha materia prueba de referencia inadmisible.

"6) Al sentenciar al Seguro del Café al pago de honorarios de abogados."

Con excepción del cuarto error, relativo al punto de partida en el cómputo de intereses legales sobre la suma concedida, ninguno de los errores señalados fue cometido, o de haberlo sido, el mismo no fue perjudicial.

I

Los demandados-recurrentes discuten conjuntamente los dos primeros errores. Sostienen que el Seguro del Café no estaba obligado a pagar al agricultor Pons las pérdidas sufridas por él con motivo del ciclón "Santa Clara" porque no existió un contrato de seguro entre él y el Seguro del Café que las cubriera "a la luz de las disposiciones de reglamento y de ley."

Según revela el "Historial" que sigue a la Sección 281 del Título 5to de las *Leyes de Puerto Rico Anotadas*, los esfuerzos del gobierno desde principios del presente siglo hasta hoy por el mejor desarrollo y bienestar de su agricultura cafetalera, han sido constantes.

Por Ley número 198 de 26 de marzo de 1946 se estableció una Comisión Rehabilitadora de la Industria Cafetalera. En ese año la Número 278 de 5 de abril creó la corporación del Seguro del Café. Su exposición de motivos es como sigue:

"Exposición de Motivos.—Es de todos conocido que, para fines del Siglo XIX la agricultura cafetalera de Puerto Rico era la primera en esta Isla, lo que le dio marcado renombre y prestigio, además de que, de ella dependían para su subsistencia

y vivían un gran por ciento de nuestra masa trabajadora campesina, así como un gran número de los agricultores dedicados al cultivo del valioso grano.

"Con motivo de los repetidos huracanes y ciclones que han azotado a esta isla y reconociendo que este peligro es una continua amenaza para nuestra industria cafetalera, cosa imposible de evitar, por encontrarse la isla en una posición geográfica que la tiene expuesta en la época ciclónica a dichas ocurrencias de la naturaleza, y habiendo la agricultura cafetalera de Puerto Rico cedido en importancia en los últimos años, con motivo de esta y otras razones y hechos ocurridos, nuestro gobierno, velando por el mejoramiento de la agricultura cafetalera de Puerto Rico, para asegurarle una mejor vida y estabilidad económica en cuanto se refiere a razones de carácter imprevisto e imposible de evitar, buscando remedio a estos males y para vitar la desaparición de la agricultura cafetalera, cree necesario e imprescindible como una medida de gran alivio a la misma, el proveer de un seguro a nuestros agricultores cosecheros de café contra aquellas arremetidas inevitables de la naturaleza como lo son los huracanes y ciclones que resultan ser principalmente causantes de la merma y descenso que ha sufrido nuestra agricultura cafetalera."

El objetivo del seguro se expuso así en su Art. 2:

"El propósito y fines del Seguro del Café ... será proveer *adecuados seguros* a los agricultores de café contra las pérdidas que éstos pudieran sufrir a consecuencia de huracanes, lo que podrá hacer, o dedicándose al negocio de dichos seguros, u obteniendo los mismos de otros aseguradores, o de ambas maneras. El Seguro ... deberá propender a la seguridad de sus fondos y recursos, pero tal propensión *no deberá ejercitarse en forma que sus propósitos y fines, según éstos han sido expuestos en la oración precedente, puedan quedar derrotados.*"—Énfasis suplido.

La Ley número 67 de 10 de junio de 1953, transfirió los poderes, facultades y funciones que correspondían a la corporación del Seguro del Café al entonces Secretario de Agricultura y Comercio y concedió a éste "capacidad de demandar y ser demandado ... y dictar reglas y reglamentos." Dicho funcionario aprobó el 1 de marzo de 1956 un "Reglamento

para el Seguro de Cosechas de Café"—Exhibit A, demandado—cuya Regla Núm. 2, en parte, dispone:

"... Las solicitudes podrán radicarse en cualquier período del año.

"Al recibo de la solicitud, el Seguro de Café podrá enviar un inspector a verificar los datos que en ella aparecieren. Después de haber aprobado la solicitud, el Seguro de Café procederá a expedir la póliza, y como tal será considerada para todos los fines.

"Tan pronto el Seguro de Café tenga información oficial de la Oficina Federal de Servicios Meteorológicos (Negociado Federal del Tiempo) en cuanto a la formación de un disturbio atmosférico en el área del Caribe, suspenderá inmediatamente la consideración de las solicitudes cuyos sobres hubieren sido cancelados por el correo con posterioridad a la hora en que se hizo el anuncio oficial del disturbio. Estas serán consideradas una vez se anuncie oficialmente que el peligro de un ciclón para la isla de Puerto Rico ha desaparecido.

" . . . . . . . .

"No existirá contrato alguno entre el solicitante y el Seguro de Café hasta tanto se hubiere aprobado la solicitud por el Seguro de Café lo que se notificará al solicitante a la mayor brevedad. La póliza de seguro será efectiva desde el momento y bajo las condiciones en que la solicitud sea aprobada. La solicitud después de aprobada formará parte de la póliza y así será considerada para todos los fines."

La cláusula de vigencia de ese reglamento dispone lo siguiente:

"Regla núm. 23
Vigencia

"Las disposiciones de este reglamento podrán aplicarse a las operaciones de seguro que realice el Seguro de Café de Puerto Rico para *el año 1956* siempre y cuando que dichas operaciones no estén en conflicto con este Reglamento, o *que la aplicación de este reglamento a dichas operaciones no lesione derechos contractuales.*"—Enfasis suplido.

La solicitud para renovación de seguro que se hizo a nombre del agricultor Bernardo Pons y la póliza que se le expidió en 13 de agosto de 1956, se hicieron usando las formas impre-

534

sas preparadas por el propio funcionario. Al dorso de la póliza aparecen impresos bajo el título de "Condiciones Generales" veinticuatro artículos. En el número 20 dice "El Seguro se reserva el derecho de cambiar el tipo de la prima, valor del quintal de café y provisiones de este contrato de año en año."

Nos piden los funcionarios recurrentes que toda vez que el Seguro del Café no aprobó la solicitud de Pons ni libró la póliza antes del ciclón de Santa Clara, resolvamos que ningún derecho tiene a cobrar las pérdidas que tuvo a consecuencias de ese ciclón porque, además de lo dispuesto en dicho Reglamento, nos obliga a ello los artículos 1213 y 1214 de nuestro Código Civil.[1] ■

No estamos ante un simple contrato de seguro civil o mercantil. Aunque es uno voluntario, el seguro de cosecha de café envuelto en esta acción, no tiene un pleno origen en la autonomía contractual privada, sino en una actividad o servicio público del Estado, dentro de la zona de los negocios, en su esfuerzo por promover el bienestar general público por medio de la mayor expansión, seguridad y rendimiento de su producción agrícola.[2] ■

---

[1] Disponen estos artículos:

"Artículo 1213.—No hay contrato sino cuando concurren los requisitos siguientes:

"1. Consentimiento de los contratantes.
"2. Objeto cierto que sea materia del contrato.
"3. Causa de la obligación que se establezca.
"Artículo 1214.—El consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato.

"La aceptación hecha por carta no obliga al que hizo la oferta sino desde que llegó a su conocimiento. El contrato, en tal caso, se presume celebrado en el lugar en que se hizo la oferta."

[2] Ejemplos de otros seguros creados por nuestro gobierno los encontramos en las leyes sobre compensación a obreros por accidentes del trabajo, el relativo a pagos a obreros de la industria azucarera, el seguro para chóferes y otros más.

Podrán ser aplicables a esos seguros, en forma supletoria, algunas disposiciones sobre obligaciones y contratos de nuestro Código Civil, siempre que no se derroten sus propósitos y fines según definidos por la ley especial que los estableció. Art. 1043, Código Civil. Ya hemos visto en la transcrita Exposición de Motivos de la ley que autorizó el seguro cafetalero, que éste ha sido concebido como una gran medida de estímulo para (1) velar por el mejoramiento de la agricultura cafetalera, (2) asegurarle una mejor vida y estabilidad económica, y (3) evitar su desaparición. Si bien dispuso esa ley que el Seguro del Café debería propender a la seguridad de sus fondos y recursos, también dispuso que "tal propensión no deberá ejercitarse en forma que sus propósitos y fines . . . puedan quedar derrotados." Art. 2, según enmendado por la Ley Núm. 22 de 1 de julio de 1947. ■

En la determinación judicial de la existencia y validez del contrato de seguro cafetalero en discusión, no debe prevalecer un criterio riguroso, legalista o necesariamente negativo, sino uno liberal, que promueva los fines y propósitos legislativos del estatuto, no que los destruya. Deben, pues, estar entonces presentes las condiciones adversas de esa casi única actividad agrícola, que se debate en nuestras regiones montañosas entre realidades de agobio económico, de sacrificios personales, de emigración constante de la masa trabajadora rural a la zona urbana y de amenazas y azotes por ciclones y huracanes. La resolución de toda duda razonable y fundada a favor de su existencia y validez debe ser la regla.

Aquí se trata de la renovación de un contrato de seguro de cosecha de café. El agricultor Pons había asegurado sus cosechas en años anteriores al 1956. Para solicitar esa renovación la ley no fija fecha alguna. El Reglamento es el que dispone que las solicitudes podrán radicarse "en cualquier período del año." Desde luego, todo contrato de seguro debe celebrarse antes de haber ocurrido el daño o riesgo objeto del mismo, por regla general, puesto que si ha ocurrido

y lo sabe el asegurado, falta la incertidumbre que es elemento esencial del contrato de seguro.—Véase el hoy derogado Art. 1697 del Código Civil.

El tribunal de instancia, con evidencia incontrovertida, determinó que la solicitud de renovación fue suscrita y jurada a las ocho de la mañana del día viernes 10 de agosto de 1956, en Utuado, y que en ese mismo día "entre las 11:30 A.M. y 12 M." junto con un cheque a favor del Secretario de Hacienda por el importe total de la prima del seguro, se depositó en la oficina de correos de Utuado, en un sobre dirigido al Departamento de Agricultura y Comercio, Seguro del Café, Parada 19, Avenida Fernández Juncos, Santurce, Puerto Rico.—Véanse Exhibits I, II y XIX, demandante, y testimonios de Víctor M. Barranco, págs. 13 a 16, taq. C. Pérez, y de Arsenio Matos, págs. 84 a 86 de la misma transcripción.—Determinó, además, que el anuncio del disturbio atmosférico que ocurrió y se conoce como temporal "Santa Clara" o "Betsy" se hizo a las doce del meridiano de ese día viernes 10 de agosto de 1956, "con posterioridad al envío o depósito en el correo de Utuado de la solicitud de renovación de seguro de cosecha de café y cheque cubriendo el pago de la prima . . .", y también que, no obstante haberse depositado el sobre durante la mañana, ese sobre fue matasellado en Utuado con un matasello que marca la hora de las 5:00 P.M.

El ciclón ocurrió el domingo 12 de agosto. En el siguiente día, lunes 13, se recibió en la oficina del Seguro del Café, en Santurce, el sobre conteniendo la solicitud de renovación y el cheque. Pero se extendió la póliza fechada el 13 de agosto de 1956 "a fin de no cubrir las pérdidas ocasionadas por el temporal 'Santa Clara' o 'Betsy.'"

Según el tribunal a quo, a David Matos, otro cosechero de café de Utuado, cuya solicitud se remitió el mismo día viernes 10 de agosto y se recibió junto con la de Bernardo Pons, en el mismo día lunes 13 de agosto, "se le extendió una póliza fechada con anterioridad al día en que se recibió su

solicitud ... y se le compensó las pérdidas ocasionadas por el temporal ..." (³)

La Regla Núm. 2 solamente autoriza la suspensión de la consideración de las solicitudes cuyos sobres hubieren sido cancelados por el correo con posterioridad a la hora en que se hizo el anuncio oficial del disturbio, y deberán ser consideradas una vez se anuncie oficialmente que el peligro de un ciclón ha desaparecido. La regla no dice que se negará la expedición de la póliza en los casos en que aparezca que la solicitud se ha enviado en un sobre matasellado con posterioridad al anuncio de temporal. Simplemente dispone que en ese caso se suspenderá la consideración de la solicitud y se continuará al cesar el peligro. ■

Según el Diccionario de la Real Academia Española, Edición de 1956, "Considerar" significa: "Pensar, meditar, reflexionar una cosa con atención y cuidado. Juzgar, estimar." Como dicen los propios recurrentes, es la función de estudiar los méritos de cada caso particular y el riesgo que ha de asumir en cada contrato.

Indican éstos, a la página 7 de su alegato, que "parece evidente que el matasellos se usa como evidencia de buena o mala fe por parte del solicitante del seguro." Si esa manifestación es la expresión del criterio usado por el Seguro del Café para aprobar o denegar lo expedición de una póliza—como resulta que exclusivamente lo fue en el caso de Bernardo Pons,—los propósitos y fines de la ley y los programas y servicios que la misma crea, pueden resultar burlados o derrotados.

Si "todas las transacciones de seguro de café se hacen a través del correo, ya que no existen oficinas en la Isla" como

---

(³) Resulta del testimonio del Sr. Puro A. Camacho, Director Auxiliar del Seguro del Café, que en el sobre en que David Matos remitió su solicitud no se podía leer la hora marcada con el matasello, por lo que no se sabía si fue remitido antes o después de las doce meridiano del día 10 de agosto y que en tales condiciones "Había una duda con respecto a eso, y el beneficio se determinó que se le diera al agricultor."—pág. 41, T. C. Pérez.

538

concluyó el juez sentenciador, y si, como también concluyó, las prácticas de matasellar no son iguales en todas las oficinas de correos y el despacho de correspondencia se rige por el reglamento interno de cada oficina, y si, específicamente, en Utuado la correspondencia se recoge solamente dos veces al día, o sea a las 11:30 A.M. y a las 5:00 P.M., ¿qué valor confiable como criterio de buena fe puede tener un matasello cuya impresión no puede indicar siempre el momento exacto de echarse una carta en el buzón postal? Ninguno, a nuestro juicio.

Si "considerar" es la función de estudiar los méritos de cada caso particular, como afirman los recurrentes, la solicitud de Bernanrdo Pons jamás fue considerada. Si se le hubiera concedido alguna atención y cuidado, muy fácil hubiera sido conocer que la solicitud fue jurada a las ocho de la mañana del día viernes 10 de agosto, ante Víctor M. Barranco, empleado público autorizado para tomar los juramentos de esas solicitudes, residente en Utuado; que antes de las doce del meridiano del mismo viernes fue depositada en la oficina de correos de Utuado, por Arsenio Matos, persona residente en Jayuya, y que la carta que se echa al buzón entre las 11:30 A.M. y 5:00 P.M. siempre se matasella con el matasellos de las 5:00 P.M.

¿Por qué se hizo una especie de investigación respecto a la solicitud de David Matos que se recibió el día 13, después del ciclón, y se le expidió la póliza entonces con efectos retroactivos al 10 de agosto y se dejó de hacer respecto a la solicitud de Pons?—Véanse las páginas 44 y 45, T. C. Pérez.

La solicitud cumplía con todos los requisitos necesarios para expedir la póliza, (⁴) por ello la póliza fue efectivamente expedida, aunque para tener vigencia desde el 13 de agosto de 1956, cosa no pedida por el agricultor, a quien tampoco se le consultó al respecto.

_____
(⁴) Cuando se le preguntó, durante el juicio, al Director Auxiliar del Seguro del Café, Sr. Puro A. Camacho, si la solicitud del Sr. Pons "era una solicitud debidamente hecha", contestó: "Perfectamente."—pág. 24 T. Perocier.

La propia prueba presentada por los funcionarios recurrentes demostró que la política del Seguro del Café era considerar "automáticamente asegurada" la cosecha después de solicitar. Así se desprende de la siguiente parte del testimonio del mencionado Director Auxiliar, Sr. Puro A. Camacho:

"P. ¿En alguno de esos puntos de Puerto Rico hay alguna oficina de Agricultura y del Seguro del Café donde el agricultor pueda ir a pagar el seguro del café o tenía que mandar desde los campos más remotos de Puerto Rico, por correo, la solicitud y el pago a San Juan?

"R. Eso está provisto por el reglamento.

"P. ¿Yo le pregunto de dónde había que mandarlo?

"R. A San Juan.

"P. Le pregunto también si había algún agente en algún punto de Puerto Rico autorizado para recibir, para encargarse de la solicitud y la póliza o el agricultor tenía que mandarla acá a San Juan?

"R. No tenemos agentes autorizados. Déjeme explicar. No tenemos gente autorizada porque el mismo reglamento protege al agricultor que inmediatamente después de solicitar, en cualquier sitio antes de cualquier anuncio meteorológico, esa solicitud se considera automáticamente asegurada."

La solicitud de Pons cumplía con todos los requisitos para que se considerara "automáticamente asegurada." La Regla 23 sobre vigencia del Reglamento facilitaba que la política del seguro automático cubriera especialmente las solicitudes del año de 1956 de los agricultores, al disponer que dicho Reglamento no sería aplicable a las operaciones que realizara el Seguro de Café de Puerto Rico para el año 1956 si su aplicación a dichas operaciones lesionaba derechos contractuales.(5) ■

---

(5) Después de comenzarse este pleito, o sea, en 30 de abril de 1957, el Secretario de Agricultura y Comercio aprobó un Reglamento Sobre el Seguro de Plantaciones de Café y, además, otro Reglamento Sobre el Seguro de Cosechas de Café. En el primero, y en su Art. 2 se insertó la cláusula de no existencia del contrato hasta que se aprobara por el Seguro del Café, pero en el segundo Reglamento no se insertó.—Ver Reglas y Reglamentos de Puerto Rico, Tit. 5, Secciones 294-2 y 294-42.

El agricultor que solicita su seguro y satisface la prima correspondiente a tiempo y en forma ha cumplido la parte que le correspondía en la formación, existencia y vigencia del seguro establecido por ley. Los hechos determinantes de la efectividad de sus derechos no pueden quedar invalidados por la negligente y descuidada consideración de su oportuna solicitud. Aplicar al presente caso los preceptos de los Arts. 1213 y 1214 del Código Civil sería, como muy bien dijo el tribunal sentenciador, destruir "los propósitos y política pública que inspiran la ley especial que creó el Seguro del Café." (6)

## II

El tribunal a quo, como hemos visto, determinó que el 4 de noviembre de 1956 Puerto Rico fue azotado por vientos huracanados conocidos por el nombre de "Greta" y que el Seguro del Café pagó por pérdidas ocasionadas a muchos asegurados; que el demandante tuvo pérdidas de café a consecuencia de dichos vientos que montaron a 125 quintales y que se negó a pagárselos porque el demandante le notificó esas pérdidas el 17 de noviembre, tres días después de expirar el término de diez días que le concedía el Reglamento para ello. Pero también concluyó en que esa dilación no ocasionó daños sustanciales de clase alguna al asegurador, porque éste "no estuvo preparado con personal para inspeccionar las pérdidas por motivo del 'Greta' hasta el 27 de noviembre de 1956." ■

Sin duda alguna los propósitos y fines de la notificación de pérdidas dentro de un plazo determinado, en toda operación de seguro, es a los efectos de que el asegurador pueda practicar prontamente la investigación correspondiente respecto a las causas del siniestro, y la naturaleza y cantidad de daños o pérdidas para poder preparar su defensa. (7) ■

---

(6) Véanse *Brown v. Pilot Life Ins. Co.*, 194 S.E. 121, y *Phillips Ruffing Co. v. Maryland Broadcasting Co.*, 40 A.2d 298.

(7) *Faulkner v. Nieves*, 76 D.P.R. 434, 439 (1954).

Si el Seguro del Café no tuvo personal alguno hasta el día 27 de noviembre para inspeccionar las fincas azotadas por "Greta", ningún daño se le ocasionó al notificársele por el demandante el 17 de noviembre de pérdidas en su finca. Es más, después de la notificación no hizo inspección alguna de la finca del demandante. En el citado caso de *Faulkner*, a la página 440, dijimos:

"Por otra parte, para que el incumplimiento de la obligación de notificar por escrito releve a la aseguradora de responsabilidad es necesario que ésta demuestre que tal incumplimiento le causó daños sustanciales." ■

Ningún daño demostró el Seguro del Café haber sufrido debido al recibo de la notificación el 17 de noviembre. (8)

### III

La sentencia recurrida condenó al Seguro del Café a pagar al demandante $12,250, importe total de las pérdidas sufridas por éste, "más intereses legales a partir de la ocurrencia de cada uno de los referidos siniestros en la cantidad que corresponda a compensarse..."

Los recurrentes alegan que ese pronunciamiento sobre intereses es erróneo porque es contrario al Art. 8 de la Ley

---

(8) En el recurso de revisión número 47, *Luis Rivera Santos, recurrente, v. Angel Mejía, recurrido,* tuvimos la oportunidad de examinar y estudiar esa cuestión. En ese caso el Seguro del Café se negó a pagar al agricultor asegurado las pérdidas que tuvo a consecuencia de "Greta" por haberlas informado un día después del término reglamentario de diez días. El juez sentenciador dictó sentencia obligando al Seguro del Café a pagar las pérdidas y formuló conclusión similar a la del presente caso de Pons, respecto a que el Seguro del Café dentro de los siguientes diez días al siniestro no estaba preparado ni en condiciones de practicar inmediatamente la investigación correspondiente para la protección de sus intereses, por falta de personal y organización. Allí se hizo referencia también a la renuencia de los tribunales americanos a declarar confiscados o perdidos los derechos de los asegurados por el mero hecho de radicar sus reclamaciones fuera del término establecido en la póliza para ello, cuando no se demuestra que tal dilación resultó perjudicial al asegurador. Se solicitó la revisión del fallo a base de fundamentos iguales en su esencia a los que en el presente recurso se aducen sobre el punto. Nos negamos a expedir el auto por falta de méritos del recurso el 14 de noviembre de 1958 y desestimamos la moción de reconsideración que luego se presentó.

Núm. 104 de 1955 y porque "la deuda por concepto de pérdidas sufridas, no era líquida y exigible al momento del siniestro, teniendo que ser determinada de acuerdo a inspecciones a realizarse para determinar las pérdidas sufridas y en el caso de autos vino a determinarse por la corte." ■

El primer fundamento no es válido. Aquí no se trata de una sentencia contra el Estado, sino contra una entidad denominada Seguro del Café de Puerto Rico, creada por ley, con capacidad suficiente para demandar y ser demandada, cuyos poderes y facultades "para llevar a cabo el negocio de seguros de cosechas y/o plantaciones de café contra pérdidas por huracanes" incluyendo la capacidad de demandar y ser demandado" y el derecho a "usar el nombre o razón social 'Seguro de Café del Estado Libre Asociado de Puerto Rico'" fueron traspasados al Secretario de Agricultura y Comercio, hoy Secretario de Agricultura.—Secs. 290 a 309 del Título 5, L.P.R.A. ■

El segundo fundamento es meritorio. La obligación de pagar las pérdidas no puede considerarse liquidada, vencida y exigible desde las fechas de los ciclones. El demandante en su demanda alegó, entre otras cosas, que el Seguro del Café se había "negado a liquidar y pagar los daños y pérdidas ocasionados a la cosecha de café . . .; no ha procedido a la inspección o verificación de datos . . ." y alegó pérdidas por valor de $14,500. El tribunal a quo las rebajó a $12,500, luego de haber hecho la liquidación de esas pérdidas al formular sus conclusiones. Debe modificarse la sentencia a los efectos de fijarse el pago de intereses legales sobre el principal de la sentencia a partir de su fecha, es decir, desde el 24 de enero de 1958. ■

## IV

Es cierto que, como regla general, los artículos o informaciones de periódicos no son admisibles como evidencia sobre los hechos que en los mismos se relatan, por constituir evidencia de referencia. El tribunal a quo debió denegar la

admisión de los que ofreció la parte demandante frente a la firme y razonable oposición de la parte demandada a su admisión.(⁹)    Sin embargo, nada encontramos en las conclusiones fundamentales del tribunal que nos indique que tales artículos influyeran decisivamente en el ánimo del juzgador para llegar a ellas.    Lo que el tribunal expresó respecto a la política pública del Estado respecto al café está sostenido por la Exposición de Motivos que insertamos en esta opinión y por el lenguaje de las leyes sobre la materia que hemos citado. ▮

## V

·    Al imponer el pago de honorarios de abogados, el juez determinó que los demandados recurrentes habían actuado con temeridad.    Nada surge de los autos que nos obligue a alterar esa determinación.    Los honorarios de abogados no se impusieron al Estado.    Fue a los demandados en su capacidad de gerentes o administradores de un negocio de seguros, habiéndosele concedido a uno de ellos, entre otras facultades, la de demandar y ser demandado y el uso de un nombre o firma social para esas negociaciones. ▮

La imposición de honorarios de abogados en las reclamaciones contra el Seguro del Café fue autorizada por el Art. 7 de la Ley Núm. 67 de 10 de junio de 1953, que pasó a ser la Sección 309 del Título 5 de Leyes de Puerto Rico Anotadas.

*La sentencia recurrida deberá ser modificada únicamente a los efectos de que por la misma se disponga que los intereses sobre su principal deberán ser pagados a partir del 24 de enero de 1958 y hasta la fecha de su pago total por el funcionario o autoridad que por ley deba hacer ese pago, y, así modificada, será confirmada.*

---

(⁹) Los títulos de esos artículos y sus textos no eran del todo halagadores para el Secretario de Agricultura y Comercio codemandado.    Algunos de los primeros eran así: "PARA SEGURO DEL CAFÉ, SUSPENSIÓN SOLICITUDES INQUIETA"; "GOBERNADOR ORDENA ACEPTAR SEGURO CAFÉ.    Así REVOCA ACCIÓN TOMÓ RIVERA SANTOS", "TESTIMONIO RIVERA SANTOS DISGUSTA A LOS LEGISLADORES Y A CAFICULTORES."    Exhibits 21, 23 y 24, Demandantes.